

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00484-CV

IN THE INTEREST OF C.D.S.-C.
AND B.L.S.-C., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In two issues, Appellant Mother appeals the termination of her parental rights to her children, C.D.S.-C. and B.L.S.-C.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Procedural Background

The trial court terminated Mother's parental rights to C.D.S.-C. and B.L.S.-C., twin boys born on August 3, 2011, after finding by clear and convincing evidence that she had endangered the children under section 161.001(1)(D) and (E), had had her parental rights to other children terminated based on subsections (D) or (E), had constructively abandoned the children, and had failed to comply with the provisions of a court order that specifically established the actions necessary for the return of her children and that termination of her parental rights would be in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (M), (N), (O), (2) (West Supp. 2012). E.S., the children's alleged father, signed an irrevocable affidavit relinquishing any rights he may have had to the children and does not appeal.

## III. Best Interest

In her second issue, Mother argues that there is legally and factually insufficient evidence to support the trial court's best interest finding.

### A. Standard of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. *Id.* § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Mother concedes that the evidence is sufficient to terminate her parental

2

rights under subsection (M) because she had previously had her parental rights terminated to other children under subsection (D) or (E).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001, § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008).

Here, in evaluating the evidence for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that termination is in the children's best interest. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

3

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Evidence

### 1. Mother's History, 2004–2011

Besides C.D.S.-C. and B.L.S.-C., twin boys born on August 3, 2011, Mother's parental rights previously had been terminated to her four other children: Mary (born in 2001), Natalie (born in 2002), David (born in 2005), and Norene (born in 2010).[2]

The trial court admitted Mother's records from John Peter Smith hospital (JPS), which included Mother's January 3, 2011 psychological evaluation with Dr.

---

[2]We use pseudonyms for Mother's other children's names, as well as the names of any caregivers and family members, to protect the children's identities. *See* Tex. R. App. P. 9.8 & cmt.

4

Nichelle Wiggins from the CPS case involving Norene, as well as Mother's November 5, 2004 psychiatric evaluation from the first CPS case involving her older children. The trial court also admitted certified copies of Mother's judgments of conviction from 2004 to 2009, for offenses that ranged from theft by check to drug possession, assault, harassment, and criminal trespass.

Fred W., the alleged biological father of Mary, Mother's oldest child, was incarcerated for twenty years on drug-related charges. Mother was also involved with his brother, Mario L., a drug dealer and the adjudicated father of Natalie and David, when she and Richard H., Norene's father, would break up. Mother identified E.S. as the twins' father and told the CPS investigator that E.S. was in jail for the next five years.

According to Mother's criminal records and what Mother told Dr. Wiggins, Mother's first CPS case began in November 2004, when she was twenty-one years old and involved in a violent domestic relationship with Mario L. Mario L. made Mother participate in group sex and gave her sexually transmitted diseases; however, although Mario L. was HIV positive, to her knowledge, Mother was HIV negative.

Mother said that after an incident with Mario L., she left Mary and Natalie with her apartment's maintenance man's wife before leaving for JPS in an ambulance. Mother was arrested at JPS after she undressed and "three dimes" of crack cocaine, which Mario L. had given her to sell and which she had

forgotten about, fell out of her brassiere.  The maintenance man and his wife called CPS.[3]

In Mother's November 2004 psychiatric evaluation, Mother described the JPS incident, stating that when the drugs were discovered, she became psychotic and started yelling, "Crack kills!"  When asked in the evaluation about her explosive outbursts and frequent physical violence, Mother said, "I bite my baby's daddy."  Mother also indicated in the evaluation that she did not use birth control or practice safe sex, that she might be pregnant, and that she had "probably had every sexually-transmitted disease."  In the 2011 evaluation, Mother told Dr. Wiggins that she had gone to JPS for medication but quit going because they thought she had hallucinations; Mother said that she had just not been in her right state of mind when she told them everything about her past and shouted out things like, "Crack kills!"  Mother told Dr. Wiggins that she was too ashamed to go back to JPS.

After the JPS incident, CPS put Mary and Natalie in foster care, and Mother began participating in CPS services.  David was born during this case, which closed after Mother successfully completed her CPS services, found a job,

---

[3]Mother said that the maintenance man and his wife had lied when they told CPS that Mother was going to hurt her children with a hammer.  The affidavit supporting DFPS's original petition as to C.D.S.-C. and B.L.S.-C. contained Mother's prior CPS history, which included the November 2004 allegation that Mother had dropped her children off with strangers and said, "[Y]ou take my kids or I will hit them in the head with a hammer," that Mother was transported to the JPS psychiatric ward after this report, and that Mother was subsequently arrested for possession of a controlled substance.

6

and started taking her medication. Family Based Safety Services (FBSS) monitored Mother when the children were returned to her. Maureen Oderoh, the FBSS supervisor on the case in December 2005, said that Mother was calm when she was on her medication and that the FBSS case closed because Mother was complying with her medication.

Mother had received community supervision in exchange for pleading guilty to possession of a controlled substance (cocaine). However, she violated her community supervision when she went to Richard H.'s mother's house on December 3, 2006, fought with his mother and sister, and was charged with assault. Mother's children, who were in the car, saw the fight. Additionally, in December 2006, FBSS opened a new case after a "report had been called in whereby [Mother] was screaming at the kids, hitting the kids"; CPS found the report "Reason To Believe." Oderoh testified that although services were offered to Mother, "nothing ever took place because she was arrested soon after that."

Mother fought with the bailiff at the revocation hearing. When she described the incident to Dr. Wiggins, Mother acknowledged that she had an "attitude" but said that she had never cursed out the bailiff or the trial judge. Mother's community supervision was revoked on February 26, 2007, and she received six months' confinement in state jail as punishment for the possession offense. On the same day as her possession conviction, Mother pleaded guilty and received 180 days' confinement for the December 2006 assault causing

7

bodily injury offense at Richard H.'s mother's house, as well as the criminal trespass and harassment offenses arising from the same incident.

Mother said that she was upset and unstable when released from jail, that Richard H. would call the police on her for trespassing, and that she would go to jail every weekend because of their arguments. Mother pleaded guilty to committing criminal trespass against Richard H. on September 18, 2007; November 11, 2007; and December 6, 2007, and terroristic threat against him on January 23, 2008. She pleaded guilty to violating his protective order against her on February 21, 2008, and March 24, 2008.

Mother's medical records included documentation of MHMR services that Mother received while in jail. On December 27, 2006, it was noted that Mother had been in jail since December 21 and had not showered and other inmates had said that Mother talked to herself and got angry when asked to bathe. On September 21, 2007, and again on October 24, 2007, it was noted that Mother said that the dead talk to her.

Mother never completed her CPS services in the second CPS case, and her parental rights were involuntarily terminated to Mary, Natalie, and David on March 4, 2008, based on subsections (D), (E), and (N)—that is, both of the endangerment grounds and constructive abandonment.

Norene was born on September 2, 2010. CPS removed Norene from Mother at birth due to Mother's drug use during pregnancy and her mental health issues. Norene went into foster care first and then was placed with Mother's

8

aunt-in-law. Mother lost her government-assisted housing because of drug possession charges and lived in her car until her aunt-in-law gave her a place to stay; Mother told Dr. Wiggins that she could reapply for low income housing in 2014.

Gladys Demus, Norene's CPS caseworker, asked Mother to go to MHMR and community addiction treatment services (CATS); to attend parenting classes and individual counseling; and to provide a stable home. Demus testified that Mother had several issues with CATS, the biggest of which was Mother sending text messages from her cell phone during class; Demus stated that Mother's phone usage was also an issue during Mother's visits with Norene.

During her January 3, 2011 psychological evaluation with Dr. Wiggins, Mother disclosed to Dr. Wiggins that her car, which had held her driver's license, social security card, and bank card, had been repossessed on December 15, 2010; she had only had the vehicle for a month and a half before it was repossessed. Mother said that prior to the repossession, her car had been totaled in October 2010 when someone ran into her on purpose while she was transporting a dialysis patient; she lost her job afterwards.

In her report, Dr. Wiggins found that Mother had chronic mental health issues made more pronounced by stress and drug dependency issues, and she made the following additional findings:

> [Mother] presents as a person who has little insight into her motivations and shows little awareness of the consequences to others because of her behavior. A prime example of this is that she

9

was using drugs while pregnant. Sometimes women who use drugs want to be caught especially if they don't believe they are in a position to parent and it takes away that decision for them. Sometimes people use drugs when pregnant because they are self-consumed. Sometimes they continue to use drugs when pregnant because of their dependency issues. It could be one or all of these things or some other issues why she continued to use but the bottom line is that she did not think about the consequences of her behavior. [Mother] has lost three other children due to decisions she has made and she now has a fourth child and by now if she had truly wanted to be in a position to take care of that child she would have been more stable and she has not been. One must look at her behaviors and decisions and determine whether or not [Mother] has sabotaged herself because of the guilt she would have by raising one child while the other three are up for adoption. Also [Mother] admitted she finds it difficult to parent on her own.

. . . [Mother] can become highly agitated and irritable when she is under a lot of stress as she reported she gets into a lot of arguments, when someone wrongs her she feels the need to get back at them, and she is still angry about things that happened to her in the past. [Mother] also described how when she is angry it has caused problems with the police and her history well documented that.

. . . [Mother] presented as a person who is confused and who has acute psychological distress. . . . [Mother] engages in self-defeating behaviors which may set her up for repeated difficulties. She has been involved with CPS several times and she doesn't seem to profit from her experiences. Compounding her issues is that not only are her symptoms acute but they are chronic and longstanding in nature. It should be noted the prognosis is poor for significant change to occur in a short time frame.

Dr. Wiggins diagnosed Mother with severe bipolar disorder, chronic post-traumatic stress disorder, cannabis dependence, dependent personality disorder, and borderline personality disorder. She recommended against reuniting Mother with Norene and noted that Mother's prognosis was poor and that she did not have a positive history of stable parenting skills.

Mother and Richard H.'s parental rights to Norene were terminated on March 9, 2011, after Mother relinquished her rights to the child. Demus said that Mother did not make progress with her mental health issues during that CPS case and that she would be concerned if Mother were off of her medications and around the children.

In her mental health records, Mother indicated that her last use of marijuana had been in 2011 and that she had had a prior dependence on it, as well as having used cocaine daily in "2010/2011." Mother also indicated that she had suffered sexual, physical, and emotional abuse during her childhood or adolescence, that she had suffered from both hallucinations and delusions, and that she had bleached her skin to make it lighter. While in school, she had been suspended for fighting and had carried razor blades in her mouth to protect herself.

## 2. C.D.S.-C. and B.L.S.-C.

Mother tested positive for marijuana in May 2011, and the twins were born in August 2011. Arlana Stokes, the CPS investigator on C.D.S.-C. and B.L.S.-C.'s case, met with Mother at Mother's home on August 10, 2011, seven days

after the twins were born.[4]  Mother tested positive for marijuana when Stokes gave her a drug test, but Mother denied that she had been using drugs.[5]

When Stokes asked Mother about any potential caregivers who could take the twins, Mother told her that she did not have any "because all her family has convictions including drugs and murder charges" and would not pass the background check.  Mother also told Stokes that her mother, whose own criminal background included murder and drug possession charges, would not care for any children "unless they are already walking."

Stokes said that it was difficult to converse with Mother because Mother "would answer with something completely different from what" Stokes asked her.  Mother told Stokes that she had been diagnosed with depression in 2010 but had not taken any medication since February 2011 and did not feel like she needed any.  Stokes said that she thought the difficulty in communicating with Mother stemmed from Mother's mental health issues.

Christina Sanford, the CPS caseworker, testified that she received the case in early September 2011, and upon reviewing Mother's previous CPS history, became concerned about Mother's mental health and drug use.  Mother's service plan required Mother to contact Sanford once a week to give progress

_____

[4]The twins were born at thirty-four weeks and remained at the hospital for monitoring before being placed with a foster family.

[5]At trial, Mother admitted that she had used marijuana while pregnant with C.D.S.-C. and B.L.S.-C. but said that she had not used marijuana since the twins were born.

updates; to contact MHMR for an assessment and follow all recommendations from the assessment; to attend all court hearings and other meetings with CPS; to comply with all court orders and the CPS case plan; to maintain safe, clean, and drug-free housing; to attend supervised visits with the children; to participate in random drug testing; to participate in individual counseling and parenting classes; and to contact CATS for a drug assessment and follow all recommendations from the assessment. Sanford said that Mother signed her service plan on September 15, 2011, and completed her parenting classes in November 2011.

Sanford testified that in October 2011, Mother started engaging in outpatient drug treatment for marijuana through CATS and individual counseling with Christopher Hooker, a licensed professional counselor, but that Mother was inconsistent in attending both services.

Mother's CATS records indicate that she was admitted into the program on September 13, 2011, to complete twenty-eight group sessions and four individual sessions; she was discharged on January 4, 2012. Laurie Smith, the Tarrant County MHMR CATS program manager, testified that on December 8, 2011, there was a group meeting with Mother and Sanford to discuss problems with working with Mother.

Smith had had Mother in group sessions and stated,

Her behavior throughout treatment was very unpredictable. As I began to watch and listen, it was pretty bizarre, and at times, almost every time, unpredictable. She would bring her MP3 player and

13

have it on during group. She would be asked to remove it. She would be using her phone during group. One day she might wear a big hat and wear it down over her face in group. There were days she came in with her hair over her eyes, held down the whole group. There was one day that she came with a false eyelash on that was rather large, but she only had one, so pretty typical, demonstrating a lot of mental health issues and problems going on with her treatment.

Mother became upset when staff took away her phone during class and asked her to leave because of the disruption.

With regard to Mother's treatment, Smith said that she thought Mother needed both drug treatment and treatment for her mental health issues, stating:

She had a psychiatric evaluation and it was referred to in her notes January 11th, and it indicated that she had some mental health diagnoses, some substance diagnoses, and some personality disorders as well, and any time we addressed medication or any of the opposition that we dealt with in group, we got a lot of kick-back. At times, she would just be shut down emotionally. Other times, she would come loud, cursing at my staff, cussing at me. She doesn't like to be called on her behaviors and she's difficult to work with in a group setting. She can become very disruptive.

Smith also stated that some of Mother's comments about hallucinations and personal hygiene concerned her and the CATS staff, specifically, that Mother had stated in an individual session that she had a dead uncle who was visiting her, and that she had stated in a group session that she washed her "private area" with Comet bleach.

Mother told Sanford that she did not feel that she needed to be in drug classes. After the December 8 meeting, Mother voluntarily went with Sanford to JPS for a psychiatric evaluation. Sanford said that Mother was diagnosed at JPS

14

with psychosis and post-traumatic stress disorder and received a recommendation that she take psychiatric medication but that Mother was not amenable to taking the medication.

Smith said that throughout the case, Mother did not want to take mental health medications. Smith was also concerned that, if CPS returned the twin babies to Mother, Mother would not be able to cope with the challenge of caring for two infants. Smith said that Mother had completed her CATS sessions but had not completed them successfully and that she still had concerns about Mother's issues.[6] The comments section of Mother's CATS discharge information states, "Client discharged with acknowledgment of completing group sessions recommended but without a certificate of completion indicating that she had not participated in the group process and was only interested in 'doing the time.'"

Hooker testified that he first saw Mother on October 7, 2011, for a psychosocial assessment for counseling services. Hooker said that at the beginning of their first meeting, Mother was agitated and did not want to

---

[6]Smith testified that around 90% of her clientele have both mental health and substance abuse disorders and use drugs to self-medicate their mental health issues, which may have been created by drug use or pre-existing mental health disorders. Smith agreed that it was very typical for people with both mental health and substance abuse issues to work in a cycle, in which they would stay on medications for a while, then stop taking them and use illicit substances to self-medicate, and then start taking the medications again.

participate in services but that by the end of the assessment, she said she would be willing to participate in individual counseling.

Mother told Hooker that she had not previously received a mental health diagnosis; she admitted to using marijuana during her pregnancy with C.D.S.-C. and B.L.S.-C. and to having a pending possession of a controlled substance charge. At the assessment's conclusion, Hooker recommended individual counseling and a continuation of CATS. He also recommended a psychological assessment and an assessment for possible medication management. Mother began counseling with Hooker after the assessment, which continued into November and, with more inconsistent attendance by Mother, December, January, and February.

Hooker testified that Mother had difficulty staying focused during counseling and "would often go on . . . rants where she would be talking more to herself than to actually being engaged with [him] as the counselor"; he found it difficult to redirect Mother back to "something that could be therapeutically productive." In response to Hooker's talking with Mother about the importance of being on medication for her mental health issues, Mother would tell him that she did not feel like she needed to be on medication and that she felt it was not necessary for her mental state.

Mother's last session with Hooker was February 11, 2012. Hooker said that as of his last session with Mother, she continued to be agitated and to have difficulty staying focused—"much of the same behaviors [that he] had observed

16

prior in the treatment." Based on the counseling he had provided to Mother from November 2011 to February 2012, Hooker continued to have concerns about Mother's ability to parent her children and the children's safety in her home "because of the agitation and because of the difficulties staying focused in session and due to mood swings and the fact we had not really achieved anything productive over the course of treatment." He also noted that Mother's drug history was a concern and that based on what he had observed in February 2012, he did not think that it would be in the children's best interest for Mother to be a parent.

At the permanency review hearing that Mother attended on February 9, 2012, DFPS made plans to have a family group conference to identify a family member or friend for a home study for the children. Eight days later, on February 17, 2012, Mother called Sanford, told her that she had moved to Atlanta, and asked whether the case could be transferred to Georgia. Sanford said that Mother had not mentioned moving to Georgia at the February 9 hearing. Sanford discussed with Mother her concerns about Mother's ability to see the children while living out-of-state, and Mother attended the family group conference in person on February 24, 2011.

Sanford set up services for Mother in Georgia through DeKalb County. The DeKalb County caseworker visited Mother's home in April to make sure that it was stable, recommended counseling, and recommended a Community Support Individual (CSI worker), which Sanford said was like an MHMR worker

17

assigned "to manage medication, attend appointments, counseling, and things like that." However, Mother was unable to engage in services in Georgia from February 2012 to May 2012 because she had to transfer her Medicaid to Georgia. Sanford said that she explained to Mother how important it was to get the Medicaid transferred and to show stability over time.

Sanford testified that Mother did not visit the twins at all from February 2012 to May 2012, while Mother testified that she did not recall failing to visit the twins during that time and said that she recalled seeing her children every month except for September. Lisa G., the children's foster mother, said that a CPS caseworker would retrieve the twins for Mother's visits and that she did not recall more than one retrieval in February and none in March, April, or May 2012.

Sanford recounted her May 9, 2012 conversation with Mother, stating,

> [Mother] went on about 10 or 15 minutes about her previous case not being documented properly. She didn't appreciate the fact that Texas CPS was out to get her. She didn't feel that her case was moving fast enough. She's refusing to take medications and does not have—and she does not believe she has any mental health issues. She wanted to hire her own attorney. She didn't want a CPS- or court-appointed attorney. She wanted to hire Johnny Cochran. . . . She talked about someone being arrested in her family saying that they gave up on her kids, and then she went on to talk about how she was thankful that her grandmother physically disciplined her.

Sanford said that Mother confirmed that she was still not taking the medication that had been recommended after her 2011 psychological evaluation.

On June 14, 2012, DFPS filed a motion for court-ordered services, complaining that Mother had failed to comply with her service plan despite

18

numerous requests and asking the court to order Mother to comply with her service plan. Mother moved for an extension of the case because she had moved to Georgia and wanted additional time to do her services there. The trial court granted both motions.

The trial court signed the parties' agreed order, in which it, among other things, ordered Mother to file written documentation of her residence in Georgia within two weeks of the order and to allow the Georgia caseworker access to her home to make sure that it was safe, clean, and drug-free; to comply with any random drug testing required by DFPS; to sign a HIPAA release of information to provide the CPS caseworker with approval to speak with her service providers and doctors; to contact Metro Change Center to have the Texas Medicaid changed to Georgia Medicaid; to maintain weekly contact with her Tarrant County CPS caseworker; to take her medication for psychosis, post-traumatic stress disorder, and post-stress disorder; to actively participate in individual counseling; and to make arrangements to travel to Texas twice a month for two-hour supervised visits with her children.

Mother never filed anything in the trial court to comply with the order regarding housing, but she told Sanford that she was living with Richard H. in Atlanta; the Atlanta caseworker verified to Sanford that Mother's home was clean and appropriate. Sanford said that CPS was unable to obtain drug tests while Mother was in Georgia because Sanford was unable to determine where to send Mother for the drug tests.

19

Mother visited the twins in June 2012 when they were ten months old and gave Sanford a list of the prescription medications that she was taking. Mother visited the twins twice in July and once in August 2012. She did not visit them at all in September 2012, when she started engaging in individual counseling services in Georgia and working with the CSI worker. Mother had one visit with the children in October 2012 but left an hour early.

Sanford said that the last time she had observed a visit between Mother and the children was in August, but that Mother acted appropriately with them at that visit, as she had at the visits Sanford had observed in June and July. Mother called Sanford at least once a week and at the time of the trial was still attending counseling.

Sanford said that neither the Georgia CSI worker nor the Georgia counselor could recommend reunification at this time "[b]ecause [Mother] had only been working with them at this time for now four weeks."[7] Sanford said that she did not feel at this point that it would be safe to return the twins to Mother because there had not been enough progress to determine her stability. Sanford also expressed concern that Mother was living with Richard H., who was Norene's father, based on Mother's past domestic violence issues with him,

_____

[7]During cross-examination, Sanford stated that if Mother were given more time, a recommendation by Mother's counselors would determine whether Mother would be able to care for the boys.

although Mother told Sanford that she did not have any fights with Richard H. but instead had had them with Richard H.'s mother.

Sanford stated that she did not think that Mother had done enough to get the children back, although Mother could have finished the service plan and gotten her children back if she had started when she first received the plan; that she did not feel like Mother's mental health issues had been resolved; and that Mother would need more time to be successful with her medication, counseling, and staying out of trouble because she had never been able to show a history of being compliant with her medication over the years of CPS cases. Sanford said that her conversations with the Georgia service providers had confirmed her concerns about Mother's continued mental health problems, that she was asking the court to terminate Mother's parental rights to the twins because of that concern as well as "the lack of progress with the services that were offered," and that termination of Mother's rights would be in the twins' best interest. Sanford said that the twins had been placed in the same foster home for the case's duration and that the foster family wanted to adopt them.

Mother said that her mental health diagnosis was stress, anxiety, and depression; that she was currently taking Klonopin, Topamax, and Wellbutrin; that she was living in Decatur, Georgia, with Richard H.; and that Richard H.'s name was on the lease because she "didn't want to have any complications with [her] background," specifically, her criminal record.

21

Mother said that she had been taking her medications on a regular basis, that she had maintained regular contact with her CPS caseworker since she had been in Georgia, and that her home in Georgia with Richard H. was safe, clean, and drug-free.[8] Mother said that her CSI worker visited her house twice a week and that she saw her counselor once a week, that she loved the twins, and that she thought it was in their best interest to be returned to her.

Lisa G. testified that she was the twins' foster mother and that they had lived with her since August 2011; C.D.S.-C. was twelve days old when he came to live with her, and B.L.S.-C. was seventeen days old when he joined C.D.S.-C. at her house.[9] C.D.S.-C. had had a head size issue initially in that when he was around six months old, his skull had grown faster than his brain so that if he jerked his head, he could start bleeding.[10] However, the issue had resolved itself by the time of the trial, when both children were developmentally on-target.

Lisa G. said that she was a stay-at-home mother and that the twins lived in the home with her, her husband, and their adopted eighteen-month-old son and that child's six-month-old brother. They had a playroom set up for the four boys,

---

[8]Mother said that she had never had any domestic violence incidents with Richard H., but that there had been with Natalie and David's father.

[9]Lisa G. testified that B.L.S.-C. stayed at the hospital longer than C.D.S.-C. "because he was the smaller of the two and he just was not gaining weight like they wanted him to be."

[10]Lisa G. testified that Mother was not present at any of the children's doctor's visits but that she did not know if Mother had ever been notified about the doctor's visits.

and Lisa G. stayed with them all day. They would sit down as a family for dinner when her husband came home from work. She said that their home was stable and, when asked if she anticipated any problems caring for the twins financially, answered "No." Lisa G. testified that she loved the twins, that the twins were bonded with the other children in the home, that her extended family and her husband's extended family were involved with the children, and that if the trial court terminated Mother's parental rights to the twins, she wanted to adopt them.

In his report to the trial court, the children's ad litem attorney stated that he had visited Lisa G.'s home on November 12, 2012, that it was neat and clean, and that the twins appeared to be well-adjusted. He also emphasized that he did "NOT want the children returned to their biological mother. She has drug problems, mental health issues[,] and a significant criminal record."

## C. Analysis

Mother points out that the testimony at trial reflected that she was appropriate and bonded with the children at their visits, that the children were happy and healthy, and that nothing indicated that she would be unable to care for their emotional and physical needs, particularly when DFPS "never drug tested [her] to verify her compliance or lack thereof with sobriety and [she] was actively engaged with her counselor and her mental health medications." Mother also claims that DFPS never indicated during trial why the children had been removed from her and how she presented a current or future danger to the children when she had "substantially completed her service plan and was actively

23

engaged with an ongoing Georgia caseworker to assist and monitor her continued progress." Mother asserts that while she was slow at the beginning to engage in and complete her services in Texas, she performed many services while in Georgia and had engaged in counseling and completed her parenting classes; Mother also points out that she has social security insurance (SSI) income available to help her support the children,[11] that she has the CSI worker available to aid her as needed, and that Georgia's CPS caseworker equivalent found her home to be appropriate. She blames her mental health problems on her prior drug use.

## 1. Best Interest Factors

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1)  the child's age and physical and mental vulnerabilities;

(2)  the frequency and nature of out-of-home placements;

(3)  the magnitude, frequency, and circumstances of the harm to the child;

---

[11]Per Mother's disclosures in her mental health records, Mother collected SSI benefits for her anxiety and depression.

(4)   whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5)   whether the child is fearful of living in or returning to the child's home;

(6)   the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7)   whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8)   whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9)   whether the perpetrator of the harm to the child is identified;

(10)   the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11)   the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12)   whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

    (A)   minimally adequate health and nutritional care;

    (B)   care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

    (C)   guidance and supervision consistent with the child's safety;

    (D)   a safe physical home environment;

    (E)   protection from repeated exposure to violence even though the violence may not be directed at the child; and

25

(F)   an understanding of the child's needs and capabilities; and

(13)   whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)   the desires of the child;

(B)   the emotional and physical needs of the child now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the best interest of the child;

(F)   the plans for the child by these individuals or by the agency seeking custody;

(G)   the stability of the home or proposed placement;

(H)   the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)   any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the

26

presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## 2. Application

The record reflects that C.D.S.-C. and B.L.S.-C. were born in August 2011, less than a year after their half-sister Norene was born and less than half a year after Mother relinquished her parental rights to Norene. By the time the termination trial began on November 13, 2012, the twins had never lived with Mother, who admitted that she had used drugs while pregnant with them, and they had only rarely seen her. *See* Tex. Fam. Code Ann. § 263.307(b). Mother had already established a seven-year history of not taking her medication, then self-medicating, and then having her children removed by CPS and her parental rights terminated. *See id.* She had been on the giving and receiving end of domestic violence involving some of the fathers of her children and, until only two months before trial, had taken a long hiatus from working on the services needed to ensure the twins' safe return to her, after her lackluster participation before she abruptly moved to Georgia. *See id.* Most of Mother's family, with a background of drug use and criminal activity, could not provide an adequate social support system for the twins. *See id.* Therefore, we conclude that the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights to the twins would be in the children's best interest. *See J.P.B.*, 180 S.W.3d at 573.

27

Further, although the twins were too young to express their desires, they had lived with their foster family in a stable home since leaving the hospital and were cared for by two parents and the parents' extended families. Mother did not testify about how she would take care of two infants. The trial court could have chosen to believe Sanford's testimony that Mother did not visit the children for several months after she moved to Georgia, disregarding the children's emotional needs, and to disbelieve Mother's testimony that she remembered visiting the children during that time. *See H.R.M.*, 209 S.W.3d at 108; *see also In re K.S.*, No. 02-09-00331-CV, 2010 WL 2432012, at *8 (Tex. App.—Fort Worth June 17, 2010, no pet.) (mem. op.) (concluding that evidence supporting best interest was legally and factually sufficient when for the duration of the CPS case, Mother had been unwilling to cooperate with CPS and undertake services that would return the child to her even though she had already been through the process twice before when she lost her rights to two other children, and she dropped out of contact with CPS and the child's life for around six months, failed to complete her service plan after receiving two continuances so that she could do so, and had a significant substance abuse history).

Further, Lisa G. testified that she wanted to adopt the twins and, in contrast to Mother's history, presented a stable, healthy alternative for the two infants, while Mother's decision to live in Georgia with Richard H., a frequent complainant in Mother's criminal history, could have allowed the trial court to reasonably conclude that despite the Georgia caseworker's positive report on

28

Mother's home inspection, Mother still did not have a stable living environment for the twins. *See H.R.M.*, 209 S.W.3d at 108; *see also Holley*, 544 S.W.2d at 371–72 (noting that a best interest factor includes the stability of the proposed placement). And the trial court could have found that Mother's refusal throughout all of her CPS cases to acknowledge her mental health problems and to consistently take her medication and remain stable for any of her children would expose the infant twins to emotional and physical danger in the future if the children were returned to her. In light of the entire record, the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights would be in the children's best interest, despite evidence of some of Mother's recent behavioral changes before trial. *See H.R.M.*, 209 S.W.3d at 108; *see also In re S.L.-E.A.*, No. 02-12-00482-CV, 2013 WL 1149512, at *9 (Tex. App.—Fort Worth Mar. 21, 2013, no pet. h.) (mem. op.) (noting that although parent had made positive improvements in his life by renting a home, gathering the necessary items for a young child, staying off of drugs, and not committing any new crimes while the case was pending, "evidence of improved conduct, especially of short duration, does not conclusively negate the probative value of a long history of criminal conduct and irresponsible choices"). Therefore, we overrule Mother's second issue.

## IV. Motion for Continuance

In her first issue, Mother complains that the trial court abused its discretion by denying her motion for continuance.

We review the denial of a motion for continuance in a termination of parental rights case for an abuse of discretion. *See In re E.L.T.*, 93 S.W.3d 372, 374 (Tex. App.—Houston [14th Dist.] 2002, no pet.). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). Under rule of civil procedure 251, no continuance shall be granted "except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." Tex. R. Civ. P. 251. If a motion for continuance is not made in writing and verified, it will be presumed that the trial court did not abuse its discretion by denying the motion. *See E.L.T.*, 93 S.W.3d at 375 (holding that because appellant in termination of parental rights case did not comply with rule 251, the trial court did not abuse its discretion by denying her motion for continuance); *see also In re T.H.*, No. 02-07-00464-CV, 2008 WL 4831374, at *8–9 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.) (citing *E.L.T.*, 93 S.W.3d at 375, and reaching same conclusion). Further, to obtain reversal of a judgment based on an error in the trial court, the appellant must show both that the error occurred and that it probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court. *See* Tex. R. App. P. 44.1(a); *In re Baby Boy R.*, 191 S.W.3d 916, 922–23 (Tex. App.—Dallas 2006, pet. denied) (holding that even if the trial court had abused its discretion by denying the continuance, parent in termination case

30

failed to show how this probably caused the rendition of an improper judgment), *cert. denied*, 549 U.S. 1080 (2006).

Here, Mother made an oral motion for continuance before the termination trial began, seeking "some more time to complete her services which are currently in progress."[12] The trial court denied the oral motion after DFPS pointed out that the trial court had already denied Mother's earlier request for a continuance, noting, "[M]y file indicates that we've already extended this cause."[13]

The record reflects that DFPS filed its original petition in this case on August 11, 2011, and that the trial judge considered whether she could grant the

---

[12]On appeal, Mother contends that she reurged the written motion that she had filed on October 30, 2012. However, while at trial Mother had complained that she needed more time to complete her services, her previous motion states,

> Respondent asserts that she has diligently continued to work on her service plan with the case worker and counselor and *has completed all other services on her service plan*. Respondent requests additional time to demonstrate compliance on her medication and work toward meeting all requirements and prerequisites prescribed by this Court. [Emphasis added.]

The motion was verified by Mother's attorney, not by Mother. *See Humphreys v. Caldwell*, 888 S.W.2d 469, 470 (Tex. 1994) (orig. proceeding) ("An affidavit which does not positively and unqualifiedly represent the facts as disclosed in the affidavit to be true and within the affiant's personal knowledge is legally insufficient.").

[13]The trial court also denied Mother's oral motion to have an associate judge hear the case in order to give her more time to complete her counseling, after DFPS pointed out that it had relied on the trial court's denial of Mother's motion for continuance the preceding week and that its witnesses were present and ready to proceed with the trial.

continuance but noted that the case would be dismissed by law on February 9, 2013.  The trial judge stated, "I believe at the last hearing, I really looked closely at the calendar to see if we could reset it with adequate time for the drop-dead dismissal date, and I felt like there was no way we could and the Court denied that request."  On June 14, 2012, the trial court had granted Mother's motion for extension of dismissal date and for a continuance on the same day that it had signed an agreed order for the actions necessary for Mother to obtain the children's return.

Mother made an oral motion for continuance, the case had already been extended, and, contrary to Mother's argument on appeal,[14] the trial's probable outcome would not have been different based on our analysis of the evidence above, particularly in light of Mother's numerous opportunities to learn from CPS's services and to change her lifestyle for any of her children.  *See E.L.T.*, 93 S.W.3d at 375; *see also T.H.*, 2008 WL 4831374, at *9; *Baby Boy R.*, 191 S.W.3d at 922–23; s*ee also In re K.P.*, No. 02-09-00028-CV, 2009 WL 2462564, at *4 (Tex. App.—Fort Worth Aug. 13, 2009, no pet.) (mem. op.) (noting that the court has "repeatedly held" that when a parent, through his or her own choices, fails to comply with a service plan and then requests a continuance in order to

---

[14]Mother claims that had the continuance been granted, "seemingly, Appellant would have successfully completed her service plan, demonstrate[d] compliance with her medication and would have had testimony from her Georgia caseworkers supporting return of her children."

complete the plan, the trial court does not abuse its discretion by denying the continuance).  Therefore, we overrule Mother's first issue.

## V.  Conclusion

Having overruled both of Mother's issues, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, MEIER, and GABRIEL, JJ.

DELIVERED:  May 2, 2013